DEWEY & LEBOEUF LLP
1301 Avenue of the Americas
New York, New York 10019
Telephone:  212.259.8000
Facsimile:  212.259.6333
Peter A. Ivanick, Esq.
Martin J. Bienenstock, Esq.
Lawrence M. Hill, Esq.

*Attorneys for the Debtor and Debtor in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
*In re*                                                                                  :                    **Chapter 11 Case No.**
                                                                                            :
**AMBAC FINANCIAL GROUP, INC.,**                                  :
                                                                                            :                    **10-15973 (SCC)**
                          **Debtor.**                                               :
                                                                                            :
------------------------------------------------------------x

**AMBAC FINANCIAL GROUP, INC.,**                                  x
                                                                                            :
                          **Plaintiff,**                                            :                    **Adversary Proceeding No. 10-**
                                                                                            :                    **_____**
          **- against -**                                                           :
                                                                                            :
**UNITED STATES OF AMERICA,**                                        :
                                                                                            :
                          **Defendant.**                                          :
                                                                                            :
------------------------------------------------------------x

**MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY
INJUNCTION PURSUANT TO SECTIONS 105(a) AND 362(a) OF THE
<u>BANKRUPTCY CODE AND RULE 7065 OF THE BANKRUPTCY RULES</u>**

> Ambac Financial Group, Inc. ("<u>AFG</u>" or the "<u>Debtor</u>"), as debtor and

debtor in possession, hereby moves this Court for a temporary restraining order ("<u>TRO</u>")

and preliminary injunction, pursuant to Bankruptcy Code sections 105(a) and 362(a),

Rule 65 of the Federal Rules of Civil Procedure, and Rules 7001(7) and 7065 of the

Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), ordering the Internal

Revenue Service (the "IRS") to provide five business days' prior written notice (filed with the Court and served by electronic mail on Debtor's counsel) before taking any Enforcement Action (defined below) contrary to the State Court Injunction (defined below), whether or not such injunction remains in effect. In further support of this Motion, the Debtor respectfully represents:

## PRELIMINARY STATEMENT

1.      The Debtor is a holding company and has commenced this chapter 11 case with two principal goals: restructuring its debt and reorganizing around its principal wholly-owned operating subsidiary, Ambac Assurance Corporation ("AAC"), one of the largest and most vital financial guaranty insurance companies in the world. AAC's insurance policies and other financial products support a multitude of public finance, structured finance, and international finance transactions, forming the financing foundation upon which many companies, municipalities and, ultimately, a substantial number of jobs, are built. Although certain of AAC's assets are currently subject to state insurance rehabilitation proceedings, ACC's healthy corporate assets – billions of dollars of performing insured obligations – are largely free of the current rehabilitation proceedings.

2.      Within less than two weeks, the Debtor and AAC will seek approval of a rehabilitation plan in the state insurance proceedings that will ensure AAC's performing assets are not placed into rehabilitation, freeing up those assets to fund a portion of the state rehabilitation plan and generate revenues and future business for AAC. Approval and implementation of the rehabilitation plan will in turn inure to the benefit of AFG and its creditors, as the future dividends generated by AAC will, as they

did before credit crisis and the rehabilitation proceedings, provide the necessary funding for AFG to meet its own obligations.  The state insurance rehabilitation plan and the Debtor's chapter 11 reorganization strategy are the result of months of difficult and hard-fought negotiations among the Debtor and its affiliated non-debtor subsidiaries (collectively, "Ambac"), their regulators and their largest stakeholders.

3.      Just days ago, however, the IRS informed the Debtor it may take action that, if not enjoined by this Court, will crater the Debtor's reorganization and AAC's state rehabilitation plan.  Specifically, after having issued prepetition Tax Refunds (as defined below) aggregating approximately $700 million to AFG, as the tax filer of Ambac's consolidated tax group, the IRS now intends to re-assess AFG's tax liability and demand a return of the Tax Refunds, which were distributed by AFG almost entirely to AAC, pursuant to their tax sharing agreement.  Under its statutory powers, the IRS can do this and more – including creating liens and levying on AAC's assets (and the assets of AFG's other non-debtor subsidiaries which are included in Ambac's consolidated tax group) – without AFG or its creditors having notice to take preemptive actions.  If these events occur, AAC's rehabilitation plan will be scuttled and its performing assets will be pulled into the pending rehabilitation proceeding, effectively ending AFG's reorganization efforts in chapter 11.  On November 8, 2010 the Wisconsin state court administering AAC's rehabilitation expanded the scope of its previous State Court Injunction to prevent the IRS from asserting liens against and levying upon the assets of AAC and its subsidiaries.

4.      To preserve the status quo of its reorganization efforts and provide the Debtor with further opportunity to seek injunctive relief, the Debtor filed the instant

Motion, which seeks a TRO and preliminary injunction ordering the IRS to provide five business days' prior written notice (filed with the Court and served by electronic mail on Debtor's counsel) before taking any Enforcement Action contrary to the State Court Injunction, whether or not such injunction remains in effect, pending a final determination of AFG's prepetition tax liability under section 505(a) of the Bankruptcy Code. If the Court does not grant the Debtor's request for injunctive relief and the IRS places liens upon and levies AAC's assets before AFG's tax liability is determined, the IRS will single-handedly thwart AFG's reorganization proceedings, *even though it is wrong* about AFG's tax liability, without AFG having an opportunity to show it does not owe the IRS one cent. Indeed, as set forth in the adversary complaint filed concurrently with this Motion (the "Complaint"), the Debtor believes this Court will determine the Tax Refunds were based on a correct determination of its tax liabilities.[1]

5. Under these circumstances, there is no question the balance of harms clearly favor issuing an injunction. If an injunction does not issue, AFG's reorganization will effectively meet its end, robbing AFG's creditors of any chance of recovery. On the other hand, if the Court issues the limited injunction requested herein, the IRS will suffer no pecuniary harm. Instead, the status quo will be maintained, and the IRS will merely have to (i) provide notice to the Debtor (which, upon receipt of such

---

[1] This Motion and the Complaint are supported by (i) the Declaration of David W. Wallis in Support of Debtor's Request for Declaratory Judgment and Injunctive Relief (the "Wallis Decl."); (ii) the Declaration of Lawrence M. Hill in Support of Debtor's Request for Declaratory Judgment and Injunctive Relief (the "Hill Decl."); (iii) the Declaration of R. Wes Kirchhoff in Support of Debtor's Request for Declaratory Judgment and Injunctive Relief (the "Kirchhoff Decl."); and (iv) the Declaration of Thomas J. Staskowski in Support of Debtor's Request for Declaratory Judgment and Injunctive Relief (the "Staskowski Decl."), each of which was filed in support of the Complaint and Motion. The Motion and Complaint are also supported by the Affidavit of David W. Wallis in Support of Debtor's Chapter 11 Petition and First Day Motions (the "First Day Affidavit").

notice, may seek further injunctive relief) and (ii) wait for a ruling on its prepetition tax claim before it is able to take Enforcement Actions against AFG's subsidiaries.

6.      Finally, although the federal statutes and jurisprudence interpreting them are well settled, the IRS may still attempt to argue the Court cannot issue an injunction because of the effect of the Anti-Injunction Act.  The Bankruptcy Code and the United States Supreme Court precedent make clear, however, that the Anti-Injunction Act does not bar this Court from issuing the injunction the Debtor seeks.  Indeed, as discussed below (*infra* ¶¶ 46-47), the Anti-Injunction Act is the codification of the federal government's sovereign immunity, which Congress has expressly waived pursuant to amendments to section 106(a) of the Bankruptcy Code.  In fact, in section 106(a) Congress enumerated the statutory predicates for this Court's authority to issue the requested injunction and determine AFG's tax liability (sections 105 and 505 of the Bankruptcy Code) as exceptions to the government's sovereign immunity powers.

7.      For all these reasons, the Debtor believes the Motion should be granted.

## STATEMENT OF FACTS

*Debtor's Bankruptcy Filing and Background*

8.      On the date hereof (the "<u>Commencement Date</u>"), the Debtor commenced a voluntary case under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>").  The Debtor continues to operate its businesses and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

9.      The Debtor is a holding company and its principal wholly-owned operating subsidiary, AAC, is a Wisconsin-domiciled financial guaranty insurance company whose business includes the issuance of financial guaranty insurance policies to support public finance, structured finance, and international finance transactions.  Wallis Decl. ¶ 5.  AAC is subject to the insurance laws and regulations of the State of Wisconsin and is regulated by the Office of the Commissioner of Insurance of the State of Wisconsin ("OCI").  *Id.*  Until 2008, when AAC stopped selling new policies because of its deteriorating financial condition and lowered credit ratings, AAC offered financial guaranty insurance on investment grade municipal finance and private structured-finance debt obligations, such as municipal bonds and residential mortgage-backed securities. First Day Affidavit ¶ 5.

10.     The Debtor, through subsidiaries of AAC, also provided financial services, including investment agreements, funding conduits, and interest rate, currency, and total return swaps, principally to the clients of its financial guaranty business.  AAC guaranteed its subsidiaries' performance under those agreements.  First Day Affidavit ¶ 7.

*AAC'S Segregated Account,*
*General Account and Rehabilitation Proceedings*

11.     On March 24, 2010, OCI approved the establishment of a segregated account of AAC (the "Segregated Account"), pursuant to Wisc. Stat. § 611.24(2), to segregate certain non-performing segments of AAC's liabilities (together, the "Segregated Account Policies").  Wallis Decl. ¶ 6.  All policy obligations of AAC not allocated to the Segregated Account remain in the general account of AAC (the "General Account").  *Id.*  Further, on March 24, 2010, OCI commenced rehabilitation proceedings

with respect to the Segregated Account (the "<u>Rehabilitation Proceedings</u>") in the District Court of Dane County, Wisconsin (the "<u>Rehabilitation Court</u>") to facilitate an orderly run-off and/or settlement of the liabilities in the Segregated Account, including those associated with the Segregated Account Policies.  *Id.*

        12.     On June 7, 2010, AAC entered into a settlement agreement (the "<u>CDS Settlement Agreement</u>") with certain counterparties to credit default swaps (the "<u>CDS Counterparties</u>") in respect of collateralized debt obligations of asset-backed securities ("<u>CDO of ABS</u>") insured by AAC.  Wallis Decl. ¶ 7.  Pursuant to this agreement, in exchange for the termination of approximately $16.5 billion in par amount of CDO of ABS obligations, AAC paid to the CDS Counterparties $2.6 billion in cash and $2 billion of surplus notes of AAC, which have a scheduled maturity of June 7, 2020.  *Id.*  Certain other non-CDO of ABS obligations were also commuted pursuant to the CDS Settlement Agreement.  *Id.*

        13.     On October 8, 2010, OCI filed a plan of rehabilitation with respect to the Segregated Account (the "<u>Rehabilitation Plan</u>") in the Rehabilitation Court.  Wallis Decl. ¶ 8.  The Rehabilitation Plan will, if approved, provide, *inter alia*, that holders of Segregated Account Policies shall receive, in respect of claims made, a combination of cash and surplus notes of the Segregated Account.  *Id.*  Subject to OCI approval, once assets of the Segregated Account are exhausted, creditors will be able look to the General Account for satisfaction of certain liabilities to satisfy the portion of claim liability not paid by the Segregated Account in cash or in Segregated Account Surplus Notes, and further, the General Account may issue surplus notes directly to holders of Segregated Account Policies.  *Id.*  A confirmation hearing in respect of the Rehabilitation Plan is

currently scheduled for November 15-19, 2010 in the Rehabilitation Court. *Id.* Until the Rehabilitation Plan is approved, it is anticipated that no claims will be paid on Segregated Account Policies, except as approved by the Rehabilitation Court. *Id.*

14.     Although AAC has been unable to pay dividends to the Debtor for several years and will be unable to pay dividends in 2010 absent special approval from OCI, which is not expected, AAC is nevertheless one of the Debtor's most valuable assets. Wallis Decl. ¶ 9. The future value of AAC will primarily depend upon the performance of AAC's insured portfolio (*i.e.*, the ultimate losses therein relative to its claims paying resources), ongoing remediation efforts of AAC with respect to the Segregated Account Policies, and other factors, including AAC's ability to repurchase surplus notes at below face value. *Id.* The Debtor's and AAC's success in these endeavors would result in the addition of significant value to the Debtor's estate. *Id.*

*Tax Refund and the IDR*

15.     In 2008 and 2009, the Debtor filed three claims with the IRS for tentative carryback adjustments on Form 1139 (Corporate Application for Tentative Refund) as a result of the carryback to prior taxable years of approximately $33 million and $3.2 billion of net operating loss carryovers ("NOLs") in 2008 and 2009, respectively, which resulted in AFG receiving tax refunds in December 2008, September 2009 and February 2010 aggregating approximately $700 million (the "Tax Refunds") from the IRS. Wallis Decl. ¶ 10. On October 28, 2010, the IRS sent an information document request (an "IDR") to the Debtor regarding a Form 3115 Change of Accounting Methodology Request filed in 2008 and Ambac's calculation of the Tax Refund. *Id.*; Staskowski Decl. ¶ 5; Kirchhoff Decl. ¶ 18. In addition, the IRS questioned

8

certain calculations underlying Ambac's reported consolidated NOLs of approximately $7.3 billion as of September 30, 2010. Wallis Decl. ¶ 10.

16.     Upon receiving the IDR, the Debtor's management reviewed the potential ramifications of the IDR. Wallis Decl. ¶ 11. The Debtor determined that if the IRS were to take Enforcement Actions based upon the IDR prior to the adjudication of the Debtor's tax liability, there is a real risk OCI would quickly thereafter commence a rehabilitation of AAC's General Account, which would unravel AAC's Rehabilitation Plan and destroy the Debtor's reorganization prospects. *Id*. The numerous adverse ramifications that would result from a rehabilitation of the General Account are set forth in the Wallis Declaration. *Id*. at ¶¶ 12-23.

*State Court Injunction*

17.     On November 8, 2010, OCI appeared before the Rehabilitation Court seeking an expansion of a previously entered injunction (as expanded, the "State Court Injunction") to prevent the IRS from asserting liens against and levying upon the assets of AAC and its subsidiaries and to prevent AFG or AFG-related parties from pursuing specific claims against the Segregated Account, the General Account, or AAC's subsidiaries (collectively, "Enforcement Actions").[2] Wallis Decl. ¶ 25.

18.     Notwithstanding OCI's actions and the Rehabilitation Court's entry of the State Court Injunction enjoining the IRS, the Debtor is concerned the IRS may ignore the terms of that injunction and take an Enforcement Action. Wallis Decl. ¶ 26. Given that such actions would seriously jeopardize or destroy its reorganization

---

[2] The definition of Enforcement Actions is used for ease of reference only and is not intended, and shall not be deemed, to limit the scope of the State Court Injunction, the actual terms of which control.

efforts, the Debtor believes this Court should enter the TRO and preliminary injunction sought in the Motion. *Id.*

## ARGUMENT

**I.**     **This Court Has Subject Matter Jurisdiction**
           **Over the Debtor's Request for an Injunction**

19.     This Court has subject matter jurisdiction over this Motion under sections 1334 and 157 of title 28 of the United States Code. Under section 1334(b), district courts have original (but not exclusive) jurisdiction of all civil actions "arising under title 11, or arising in or related to cases under title 11." *See* 28 U.S.C. §1334(b). Pursuant to the July 11, 1984 standing order entered by the District Court in accordance with 28 U.S.C. §157(a), this Court can exercise the subject matter jurisdiction granted to the District Court. *See Adams v. Zarnel (In re Zarnel)*, 619 F.3d 156, *30-31 (2d Cir. 2010).

**A.**     Debtor's Request Under Section 505(a) for Declaratory Judgment

20.     Under section 1334(b), the determination of the Debtor's tax liability under section 505(a) of the Bankruptcy Code "arises under" title 11 because the statutory provision underlying the court's power to determine the Debtor's tax liability applies only under title 11. Under section 157(b)(2), such determination is also core. *See United States v. Wilson*, 974 F.2d 514, 517 (4th Cir. 1992) (finding a proceeding under section 505 to be 'core'); *In re Rodriguez*, 387 B.R. 76, 80 (Bankr. E.D.N.Y. 2008) (same).

B.     Debtor's Request for Injunctive Relief

21.     The Debtor's request for an injunction under section 105 of the Bankruptcy Code pending the hearing under section 505(a) also "arises under" title 11, and "arises in" a case under title 11 because an injunction of this kind, and the standards for its issuance, are unique to title 11 and apply only in cases under title 11.  In addition, this Court has 'related to' jurisdiction to issue an injunction against the IRS to protect the assets of the nondebtor subsidiaries because the dispute involves tax liability of the Debtor's consolidated tax group, and seizure or encumbrance of AAC's assets threatens AFG's survival and ability to reorganize, and thus has more than a 'conceivable effect' on the Debtor's estate.  *See Kenton County Bondholders Comm. v. Delta Air Lines, Inc. (In re Delta Air Lines, Inc.)*, 374 B.R. 516, 525 (S.D.N.Y. 2007) ("The Bankruptcy Court plainly had jurisdiction under 28 U.S.C. § 1334(b) to approve this Settlement binding nondebtors because the litigation that was settled had more than a 'conceivable effect' on the bankrupt estate").  A request for an injunction pursuant to section 105 is also a core proceeding.  *See Manville Corp. v. Equity Sec. Holders Comm. (In re Johns-Manville Corp.)*, 801 F.2d 60, 64 (2d Cir. 1986) (finding an injunction under section 105 to be  a core proceeding).  Here, the injunction would be issued to ensure the Debtor will have an opportunity for a hearing on its tax liability without being undermined by actions of the IRS against the Debtor's nondebtor subsidiaries.

22.     Even if this Court were to determine that the Debtor's request for an injunction is non-core, the interlocutory nature of a TRO/preliminary injunction allows this Court to issue the requested injunctive relief because it is not a final order or judgment.  *See Celotex Corp. v. Edwards*, 514 U.S. 300, 310 n.7 (1995) ("[T]he

Bankruptcy Court did not lack jurisdiction under §157(c)(1) to issue the Section 105 Injunction because that injunction was not a 'final order or judgment.'").

23.     Finally, because the nondebtor subsidiaries' tax liability is identical to the Debtor's liability, and the determination of the Debtor's tax liability is a core proceeding, this Court's determinations against the Debtor would collaterally estop an action by the IRS against the nondebtors.  Based on *Katchen v. Landy*, 382 U.S. 323 (1966) and the Ninth Circuit's recent interpretation of it in *Marshall v. Stern (In re Marshall)*, 600 F.3d 1037, 1058 (9th Cir. 2010), cert. *granted, Stern v. Marshall*, 177 L. Ed. 2d 1152; 2010 U.S. LEXIS 5746; 79 U.S.L.W. 3194 (Sept. 28, 2010), this Court can issue orders to protect the nondebtor entities because every fact and legal conclusion at issue against the nondebtor subsidiaries matches the issues to be determined in the core section 505(a) proceeding to determine the Debtor's tax liability to the IRS.

**II.     Debtor is Entitled to a Temporary
         Restraining Order and Preliminary Injunction**

     A.     *Injunction Standard*

24.     Section 105(a) empowers bankruptcy courts to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).  This authority under section 105 is broader than the automatic stay provisions of section 362 and may be used to assure the orderly conduct of the reorganization proceeding.  *Erti v. Paine Webber Jackson & Curtis, Inc. (In re Baldwin-United Corp. Litig.)*, 765 F.2d 343, 348 (2d. Cir. 1985).  Specifically, bankruptcy courts may employ the equitable power granted by section 105(a) independently, to protect a debtor's ability to reorganize, or together with other provisions of the Bankruptcy Code, such as section 362(a), to extend the automatic stay,

and enjoin actions against nondebtors when doing so would protect the debtor's estate. *See Queenie, Ltd. v. Nygard Int'l*, 321 F.3d 282, 287 (2d Cir. 2003) ("The automatic stay can apply to nondebtors, but normally does so only when a claim against the nondebtor will have an immediate adverse economic consequence for the debtor's estate");[3] *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Secs. LLC*, 429 B.R. 423, 434 (Bankr. S.D.N.Y. 2010) (same); *Johns-Manville Corp. v. Asbestos Litig. Group (In re Johns-Manville Corp.)*, 40 B.R. 219, 226 (S.D.N.Y. 1984) ("Pursuant to the exercise of [Section 105] authority, the Court may issue or extend stays to enjoin a variety of proceedings which will have an adverse impact on the Debtor's ability to formulate a Chapter 11 plan."); *see also E. Air Lines, Inc. v. Rolleston (In re Ionosphere Clubs Inc.)*, 124 B.R. 635, 642 (S.D.N.Y. 1991) (section 105(a) "extends to creditor's actions against third parties, when such an injunction is necessary to protect the debtors and the parties in interest to the reorganization in their attempt to reorganize successfully").[4]

25.     In determining when a section 105(a) injunction should issue, courts in this circuit apply "the traditional preliminary injunction standard as modified to fit the bankruptcy context." *Calpine*, 365 B.R. at 409 (citation omitted); *see also In re Adelphia Commc'ns Corp.*, 298 B.R. 49, 54 (S.D.N.Y. 2003) ("Because the basic purpose of [§ 105(a)] is to enable the court to do whatever necessary to aid its jurisdiction, *i.e.*,

---

[3]  In *Queenie*, the Second Circuit extended the automatic stay to the debtor's wholly-owned subsidiary because a claim against the subsidiary would have 'adverse economic consequences' for the debtor.  *Id.* at 287.

[4]  While the Second Circuit clarified in *Deutsche Bank AG, London Branch & Bear, Stearns & Co., Inc. v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136, 142 (2d. Cir. 2005) that powers under section 105 must derive from other provisions of the Bankruptcy Code, subsequent decisions have clarified that "[n]othing in the court's opinion [in Metromedia] affects the longstanding practice of courts utilizing section 105 to stay (as opposed to release) nondebtor litigation."  *Nev. Power Co. v. Calpine Corp. (In re Calpine Corp.)*, 365 B.R. 401, 409 n.20 (S.D.N.Y. 2007); *see also In re Lyondell Chem. Co.*, 402 B.R. 571 at 587 n.33 (Bankr. S.D.N.Y. 2009).

anything arising in or relating to a bankruptcy case, … the Second Circuit, courts in this District, and courts in other circuits have construed [§ 105] liberally to enjoin suits that might impede the reorganization process[,] … and embraced the use of § 105 without proof of all four factors normally required for injunctions, such as inadequate remedy of law or irreparable harm") (internal quotation marks and citations omitted). Thus, courts consider the following factors, with the modifications referred to above, in determining whether to issue a preliminary injunction: "(1) whether there is a likelihood of successful reorganization; (2) whether there is an imminent irreparable harm to the estate in the absence of an injunction; (3) whether the balance of harms tips in favor of the moving party; and (4) whether the public interest weighs in favor of an injunction." *Calpine*, 365 B.R. at 409.

      26.     Courts have recognized, however, an exception to the irreparable harm requirement "that permits the court to issue a preliminary injunction in the bankruptcy context where the action to be enjoined is one that threatens the reorganization process." *Id.* (internal quotation marks and citations omitted); *see also In re Neuman*, 71 B.R. 567, 571 (S.D.N.Y. 1987) (quoting *Henderson v. Burd,* 133 F.2d 515, 517 (2d Cir. 1943) ("since injunctions in bankruptcy cases are authorized by statute, the usual equitable grounds for relief, such as irreparable damage, need not be shown"); *Lyondell*, 402 B.R. at 588 n.37 ("[I]t has been repeatedly held in this district that the usual grounds for injunctive relief, such as irreparable injury, need not be shown in a proceeding for an injunction under section 105(a)."); *LTV Steel Co., Inc. v. Bd. of Educ. (In re Chateaugay Corp., Reomar, Inc.)*, 93 B.R. 26, 29 (S.D.N.Y. 1988) (same). Courts

take a flexible approach to evaluating these factors, no one of which is determinative. *Calpine*, 365 B.R. at 409. As discussed below, each of these factors is established here.

B. *There is a Reasonable Likelihood of a Successful Reorganization*

27. In the bankruptcy context, the "likelihood of success" prong of the preliminary injunction standard focuses on the debtor's likelihood of a successful reorganization, rather than the debtor's likelihood of success on the merits. *See, e.g.*, *Lyondell*, 402 B.R. at 589-90; *Calpine*, 365 B.R. at 410. AFG plainly has a reasonable likelihood of a successful reorganization. Where the time to submit a chapter 11 plan has not yet expired, a debtor can demonstrate a reasonable likelihood of a successful reorganization if the debtor is actively pursuing its reorganization efforts and if the action taken against the debtor would impede the debtor's ability to file its plan. *See, e.g.*, *Lyondell*, 402 B.R. at 590 n.44 (debtors in the early states of bankruptcy need not show "detailed projections of the terms or anticipated feasibility of [a] plan of reorganization"); *Steven P. Nelson, D.C., P.A. v. G.E. Capital Corp. (In re Steven P. Nelson, D.C., P.A.)*, 140 B.R. 814, 816-17 (Bankr. M.D. Fla. 1992) ("This Chapter 11 case is still in an embryonic stage and it is clearly unreasonable to require the Debtor at this early stage of the case to make detailed projections of the terms or anticipated feasibility of its plan of reorganization…. In this connection, it should be noted that there is nothing in the record to indicate that the Debtor will not be able to successfully reorganize."); *Gathering Rest., Inc. v. First Nat'l Bank (In re Gathering Rest., Inc.)*, 79 B.R. 992, 1001 (Bankr. N.D. Ind. 1986) ("[T]he Court at the early stages must make at least a rebuttable presumption that the [debtor has] made a good faith filing and [is] making a good faith effort to reorganize.").

28.     Here, AFG has had extensive discussions with its creditor

constituencies prior to the date of the Debtor's chapter 11 filing regarding its

reorganization efforts.  First Day Affidavit ¶¶ 29-34, 40-43.  Although the prevailing

circumstances still left AFG no recourse but to commence this chapter 11 case, plan

discussions were underway well before the filing, and, at the very least, AFG should be

given the opportunity to pursue a reorganization at this nascent stage of its case.  *See*,

*e.g.*, *Sudbury, Inc. v. Escott (In re Sudbury, Inc.)*, 140 B.R. 461, 466 (Bankr. N.D. Ohio

1992) ("The evidence establishes that the Debtor is hard at work on a reorganization plan.

Plaintiffs do not suggest that Debtor's effort will fail.").

> C.     *AFG's Entitlement to the Refund*
> *Will Likely Be Successful on the Merits*

29.     Although it is not necessary to show a likelihood of success on the

merits to obtain a section 105(a) injunction, that standard is plainly satisfied here as well

because the Court can and should determine AFG's tax liability under section 505 and, if

it does, AFG will likely prevail on the merits in establishing its prepetition tax liabilities

were correctly determined.

> (i)     The Court Has the Authority to
> Determine AFG's Tax Liability

30.     Section 505(a)(1) of the Bankruptcy Code, in relevant part,

provides:

> [T]he court may determine the amount or legality of any tax, any
> fine or penalty relating to a tax, or any addition to a tax, whether or
> not previously assessed, whether or not paid, and whether or not
> contested before and adjudicated by a judicial or administrative
> tribunal of competent jurisdiction . . . .

11 U.S.C. § 505(a)(1).

31.     Under section 505(a), this Court is empowered with the authority to determine the amount of any tax, fine, or penalty, and has ample discretion to determine a debtor's liability for any tax. *In re Cody, Inc.*, 338 F.3d 89, 92 n.1 (2d Cir. 2003) ("We have 'interpret[ed] the verb 'may' in 11 U.S.C. §505(a)(1) as vesting the bankruptcy court with discretionary authority to redetermine a debtor's taxes.") (bracketed language in original) (citing *New Haven Projects Ltd. Liability Co. v. City of New Haven (In re New Haven Projects Ltd. Liability Co.)*, 225 F.3d 283, 288 (2d Cir. 2000)).[5] The exceptions to a bankruptcy court's power and authority to determine a debtor's tax liability, enumerated in subsections 505(a)(2)(A)-(C) of the Bankruptcy Code, are inapplicable here.[6]

32.     Based on the foregoing, AFG submits this Court has the power, authority, and discretion to determine the amount and legality of the taxes underlying the prepetition Tax Refunds.

        (ii)    This Court's Exercise of Its Authority to Determine AFG's
                Tax Liability is Warranted under the Circumstances

33.     In *New Haven Projects*, the Second Circuit set forth a number of factors bankruptcy courts should consider in deciding whether to exercise their discretion

---

[5] Although the Second Circuit in *Cody* affirmed the lower court's decision to abstain from section 505(a) determination, the decision was based on the fact the tax claims at issue had already been adjudicated by a competent tribunal, a fact not presented here. *In re Cody, Inc.*, 338 F.3d at 95.

[6] Section 505(a)(2)(A) prohibits re-adjudication by bankruptcy courts of taxes that have already been contested and adjudicated in a tribunal of competent jurisdiction prior to the commencement of the case. As discussed above, the IRS refunded approximately $700 million in Tax Refunds to AFG after it filed claims for carryback adjustments relating to NOLs. No tribunal of competent jurisdiction rendered a prepetition judgment determining the amount or legality of AFG's tax liability. Section 505(a)(2)(B) is also not applicable, as AFG is not seeking a tax refund on behalf of its estate before the earlier of (i) 120 days after AFG's request for the refund from the IRS or (ii) the IRS's determination of the request, as the exception provides. Rather, AFG actually received the Tax Refunds prior to the Commencement Date. Finally, the third exception to section 505(a)(1), set forth in section 505(a)(2)(C), concerns ad valorem taxes on real and personal property, and is not implicated here.

to determine a debtor's taxes under section 505. Such factors include: (i) the complexity

of the tax issue; (ii) the need to administer the bankruptcy case in an expeditious fashion;

(iii) the burden on the bankruptcy court's docket; (iv) the length of time necessary to

conduct the hearing and to render a decision thereafter; (v) the asset and liability structure

of the debtor; and (vi) the potential prejudice to the debtor. *New Haven Projects*, 225

F.3d at 289 (citing, *e.g., Northbrook Partners, LLP v. Hennepin (In re Northbrook*

*Partners, LLP)*, 245 B.R. 104, 118 (Bankr. D. Minn. 2000) and *In re D'Alessio*, 181 B.R.

756, 759-60 (Bankr. S.D.N.Y. 1995)).[7] The Second Circuit further noted,

> The exercise of such discretion is, of course, subject to the explicit
> limitations in Section 505 itself, and must be informed by the
> purpose underlying the statute. Specifically, in determining
> whether to abstain from redetermining tax liability in a given case,
> a court must 'assure itself that the legislative purpose for drafting
> this provision, namely to protect the interests of both debtors and
> creditors, is met. Creditors are entitled to protection from the
> 'dissipation of an estate's assets' in the event that the debtor failed
> to contest the legality and amount of taxes assessed against it.
> Having the bankruptcy court adjudicate the matter may also afford
> an alternative forum for proceedings that might otherwise delay the
> orderly administration of the case and distribution to the debtor's
> creditors.'

*New Haven Projects*, 225 F.3d at 288 (citing *In re Onondaga Plaza Maint. Co.*, 206 B.R.

653, 656 (Bankr. N.D.N.Y. 1997)).

34.     Here, the Court should exercise its discretion to determine AFG's

tax liability under section 505. *First*, although the tax issues are complex, resolution of

AFG's tax liability will significantly facilitate the administration of AFG's chapter 11

---

[7] The *New Haven Projects* court ultimately affirmed the district court's order affirming the bankruptcy court's decision to abstain from determining the debtor's tax liability under section 505(a). However, the court based its decision on the fact that section 505 review would benefit only a single insider creditor, at the expense of other outside creditors, and thus frustrate the purposes of the statute. 225 F.3d at 290. Such circumstances are not presented here.

case.  *Second*, AFG does not believe the section 505 proceeding will unduly burden the

Court's docket or require an extraordinary amount of time to determine and render a

decision.  The issues are finite, the parties have all the information necessary to argue

their cases, and, as evidenced by the filing of the TRO motion, AFG is seeking to have

this Court address the tax liability as soon as practicable in its bankruptcy proceeding.

*Third*, given the complexity of the asset and liability structure of AFG, which is

interwoven with AAC and the other members of its consolidated tax group, this case is no

way akin to no-asset chapter 7 cases in which courts often abstain from exercising section

505 authority.  *See*, *e.g.*, *In re Ferguson*, No. 7-92-02672, 1993 Bankr. LEXIS 2022, at

*7 (Bankr. W.D. Va. Dec. 30, 1993) ("[A court] 'may and should abstain' from

determining a tax controversy in a no-asset Chapter 7 case involving no parties other than

the Debtor and the IRS….").

   35. For these reasons, this case presents the precise scenario section

505 was intended to address.  By seeking injunctive relief at the outset of its chapter 11

case, AFG hopes to stave off the IRS from changing the status quo so this Court can

exercise its authority under section 505 to determine AFG's liability and safeguard

AFG's ability to achieve a successful reorganization.  *See New Haven Projects,* 225 F.3d

at 288 (noting the purpose of section 505(a)(1) is to provide a forum for ready

determination of the legality or amount of tax claims in order to expedite such decisions

and avoid delaying the conclusion of the administration of bankruptcy estates if left to

another forum).

        (iii)     AFG Will Likely Establish it is
                      Entitled to the Full Amount of the Refund

36.     As described more fully in the Complaint, AFG submits it will prevail on the merits in establishing AFG is not liable to the IRS for any taxes and is entitled to retain the Tax Refunds. *See* Complaint at ¶¶ 42-78.

       D.    *A Denial of the Debtor's Motion Will Result in*
              *Irreparable Harm to Debtor's Ability to Reorganize*

37.     The next factor courts consider when determining whether to grant a temporary restraining order or preliminary injunction is whether denial of the motion will result in irreparable harm to the debtor's ability to reorganize. *See*, *e.g.*, *Calpine*, 365 B.R. at 410 (finding irreparable harm requirement satisfied where the action to be enjoined threatens the reorganization process). Here, AFG will undoubtedly suffer irreparable harm if its request for a restraining order and preliminary injunction is not granted and the IRS ignores the State Court Injunction and takes an Enforcement Action against the Debtor's non-debtor subsidiaries. The Debtor's financial performance has always been dependent upon the financial strength of its principal operating subsidiary, AAC. *See* First Day Aff. ¶¶ 8, 16. An IRS assessment and collection effort aimed at clawing back approximately $700 million would cripple AAC and endanger AFG's ability to reorganize. Wallis Decl. ¶¶ 11, 26.

38.     Faced with these facts, OCI would be constrained to put AAC's General Account into full rehabilitation (Wallis Decl. ¶ 11), a course that would spell certain doom AFG's reorganization efforts because of the crippling effects rehabilitation would have on AAC's core businesses. For example, with respect to the $30 billion of commercial asset backed notes insured by AAC, rehabilitation would lead to defaults by

the issuers of the notes and resultant increases in significant claims against AAC. *Id*. at ¶¶ 14-15. Leaving aside the public threat these defaults would pose to the people who depend on the ongoing viability of the issuers to make a living, AAC alone would stand to see claim liabilities increase by $1 billion or more from issuer defaults. *Id*. at ¶¶ 16-17. Rehabilitation would also accelerate interest rate and currency swaps issued by AAC's affiliates, all of which are insured by AAC and would subject the General Account to further claims. *Id*. at ¶ 18.

39. These negative effects only scratch the surface. One of AAC's affiliates has entered into interest rate swaps with municipalities throughout the United States, all of which would terminate automatically in the event of a General Account rehabilitation. Wallis Decl. ¶¶ 19-20. These terminations would subject these cash-strapped municipalities to huge payment exposures they simply could not satisfy and would leave them without replacement coverage to hedge against future interest rate volatility. *Id*. at ¶¶ 20-21. But AAC's affiliate would also suffer losses, as municipal payment shortfalls would cause a mismatch for AAC's affiliate with respect to swaps it entered into with counterparties to hedge its exposure to the municipalities' positions. *Id*.

40. Further, although most of AAC's exposure to CDS was commuted in connection with the CDS Settlement Agreement, the General Account continues to be exposed to a significant book of CDS of collateralized loan obligations ("CLOs"). Wallis Decl. ¶ 22 As with CDS exposures generally, counterparties on these agreements have a right to assert mark-to-market termination claims in the event of a rehabilitation of AAC. *Id*. Although OCI would presumably attempt to enjoin the assertion of such mark-to-market damages, there can be no assurance that such injunctions would ultimately be

successful. *Id.* The Debtor calculates AAC's exposure to such mark-to-market damage claims in respect of the CLO book to be approximately $3 billion. *Id.* In the event that OCI fails to restrain the assertion of such damages, this $3 billion in additional policyholder claims would dilute all other policyholder claims significantly and destroy AAC's residual value to AFG. *Id.*

41.     In addition to the damage to AAC discussed above, the IRS could assert liens on and could levy upon the assets of other valuable non-debtor subsidiaries of AFG included within its consolidated tax group. Hill Decl. ¶¶ 6-13; Wallis Decl. ¶ 23. These subsidiaries include (i) Everspan, an insurance company subsidiary of AAC with approximately $160-170 million of surplus, and (ii) two non-insurance subsidiaries of AAC, Ambac Financial Services, LLC ("AFS") and Ambac Capital Funding, Inc. ("AFCI"). Wallis Decl. ¶ 23. AFS engages in swap transactions with clients of AAC and the general marketplace while ACFI has a large book of guaranteed investment contract business. *Id.* If the businesses of AFS and ACFI are destroyed by an IRS Enforcement Action, both AFS and ACFI (all of whose liabilities to third parties are insured by AAC) could generate significant additional liabilities for AAC and further reduce or eliminate AAC's residual value to AFG. *Id.*

E.     *The Balance of Hardships Weighs Strongly in the Debtor's Favor*

42.     The disastrous consequences for the Debtor's reorganization that would result from an immediate assessment and collection of the Tax Refunds far outweigh any prejudice to the IRS from a limited notice injunction (subject to the Debtor obtaining further injunctive relief) in its ability to collect on its putative claim until the claim is determined by this Court. The injunction will be limited in scope and is designed solely to allow this Court to do precisely what section 505 of the Bankruptcy

Code permits it to do – determine AFG's tax liabilities, if any, owing to the IRS. If the injunction is not granted, the Debtor is concerned the IRS, with its sweeping, unilateral authority,[8] may elect to ignore the State Court Injunction. The IRS can then issue an assessment and levy against the assets of AAC – the subsidiary most integral to AFG's reorganization efforts – and end those efforts before AFG has even had a chance to show it is entitled to keep the Tax Refunds and does not owe the IRS one single penny.[9]

F.      *Granting the Injunction Serves the Public Interest*

43.     The public interest heavily favors an injunction. In issuing section 105 injunctions, courts have found that the "public interest" factor is satisfied if granting the injunction would promote a successful reorganization. *See LTV Corp. v. Back (In re Chateaugay Corp.)*, 201 B.R. 48, 72 (Bankr. S.D.N.Y. 1996) ("Public policy, as evidenced by chapter 11 of the Bankruptcy Code, strongly favors the reorganization and rehabilitation of troubled companies and the concomitant preservation of jobs and going concern values."); *Sudbury, Inc. v. Escott (In re Sudbury, Inc.)*, 140 B.R. 461, 465 (Bankr. N.D. Ohio 1992) ("Courts have generally recognized a public interest in reorganization.") (citing *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 204 (1983)); *Am. Film Techs., Inc. v. Taritero (In re Am. Film Techs., Inc.)*, 175 B.R. 847, 849 (Bankr. D. Del. 1994) (stating that in the bankruptcy context, "public interest" means promoting a

---

[8] *See* Hill Decl. ¶¶ 6-13.

[9] If the IRS is allowed to short circuit this Court's tax determination by levying on AAC's assets, other important policy objectives of the Bankruptcy Code – such as affording equal treatment to similarly-situated creditors – will be undermined because there will be no reorganized structure to create long-term value for all unsecured creditors. *See, e.g., Howard Delivery Serv., Inc. v. Zurich Am. Ins. Co.*, 547 U.S. 651, 655 (2006) ("[W]e are mindful that the Bankruptcy Code aims, in the main, to secure equal distribution among creditors."); *In re Ades and Berg Group Investors*, 550 F.3d 240, 244 (2d Cir. 2008) ("The chief purposes of the bankruptcy laws are to secure a prompt and effectual administration and settlement of the estate of all bankrupts within a limited period, to place the property of the bankrupt, wherever found, under the control of the court, for equal distribution among the creditors, and to protect the creditors from one another.").

successful reorganization, such that assisting the Debtor with its reorganization efforts is "one of the paramount interests of [the] court"). Here, AAC is AFG's largest and most significant asset. If the IRS is permitted to encumber and/or seize AAC's assets, then AAC's rehabilitation efforts will fail, which will inexorably result in AFG's inability to reorganize and maximize value. *See In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 284 (Bankr. S.D.N.Y. 2007) ("[T]he public interest cannot tolerate any scenario under which private agendas can thwart the maximization of value for all.").

G. *The Debtor Has Satisfied the Requirements for the Entry of a Temporary Restraining Order*

44. The very nature of the injunction sought by the Motion requires issuance of a temporary restraining order under Rule 65, pending a hearing on the Debtor's motion for a preliminary injunction. Such a temporary restraining order is properly granted to preserve the status quo and prevent irreparable injury to a debtor's estate and its ability to reorganize pending a preliminary injunction hearing. *See Adelphia Commc'ns Corp. v. Am. Channel, LLC (In re Adelphia Commc'ns Corp.)*, No. 06-01528, 2006 Bankr. LEXIS 975, at *11 (Bankr. S.D.N.Y. June 5, 2006). Specifically, Rule 65(b) provides:

> The court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if: (A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

Fed. R. Civ. P. 65(b).

45.     For all of the reasons set forth above in support of the Debtor's request for a preliminary injunction, it is similarly appropriate to grant a temporary restraining order pending a hearing on the Motion, staying, restraining, and enjoining any collection efforts by the United States on its purported claims.

## III.     The Anti-Injunction Act Does Not Bar the Relief Requested

46.     The "Anti-Injunction Act" is a section of the Internal Revenue Code providing that no court may enjoin the assessment or collection of any tax. *See* 26 U.S.C. §7421(a).[10]  According to the Second Circuit and other courts, the Anti-Injunction Act codifies the government's sovereign immunity to assess and collect taxes. *See Randell v. United States*, 64 F.3d 101, 106 (2d Cir. 1995) ("[i]n the context of tax assessments and collections the government's sovereign immunity has been codified by the Anti-Injunction Act, I.R.C. § 7421(a) (1988) . . . ."); *see also Murphy v. IRS*, 493 F.3d 170, 174 (D.C. Cir. 2007) (same); *Clavizzao v. United States*, 706 F. Supp. 2d 342, 346 (S.D.N.Y. 2009) (same).

47.     Congress, however, amended section 106(a) of the Bankruptcy Code to expressly waive sovereign immunity with respect to certain Bankruptcy Code sections and thereby vested this Court with the authority to enjoin governmental units such as the IRS. *See* 11 U.S.C. §106(a) ("Notwithstanding an assertion of sovereign immunity, sovereign immunity is abrogated as to a governmental unit to the extent set forth in this section with respect to the following [Bankruptcy Code sections]"). Specifically related to the relief requested herein, section 106(a) waives sovereign

---

[10] Specifically, 26 U.S.C. §7421(a) provides: "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed."

immunity as to sections 105[11] and 505 of the Bankruptcy Code. *See* 11 U.S.C. §106(a). Thus, the amendment of section 106(a) demonstrates Congress's intent to permit this Court to enjoin the IRS to preserve value for the Debtor's estate and foster reorganization. This was the precise holding of Chief United States District Judge Brown and Bankruptcy Judge Gambardella, sitting jointly in *In re G-1 Holdings Inc.*, 420 B.R. 216, 281 (Bankr. D.N.J. 2009) ("In sum, the Anti-Injunction Act does not prevent this Court from issuing an order that provisionally limits the IRS from seeking to collect additional amounts from nondebtor [subsidiary].").[12] Additionally, the United States Supreme Court ruled in *Central Virginia Community College v. Katz*, 546 U.S. 356 (2006), that the ratification of the bankruptcy clause in the Constitution was the abrogation of the states' sovereign immunity, and section 106 has made crystal clear that the federal government's sovereign immunity was waived under certain Bankruptcy Code sections. *See also Presidential Gardens Assocs. v. United States,* 175 F.3d 132, 142 (2d Cir. 1999) ("It is undisputed that 11 U.S.C. § 106 abrogates federal sovereign immunity with respect to most aspects of bankruptcy administration . . . .").

---

[11] Congress is presumed to know the existing law as new statutes are passed. *See United States v. Prof'l Air Traffic Controllers Org.*, 653 F.2d 1134, 1138 (7th Cir. 1981) ("We note initially that, in interpreting the legislative history of a statute, there is a presumption that Congress was aware of the judicial construction of existing law . . . [t]hus, a newly-enacted statute is to be read in conjunction with the entire existing body of law.") (citations and quotations omitted). As it was well established at the time of section 106's amendment that section 105 could be used for injunctive relief (*see, e.g., MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 93-94 (2d Cir. 1988)), Congress' inclusion of section 105 in the enumerated sections for which sovereign immunity has been waived is further evidence of Congress' intent to abrogate the Anti-Injunction Act through amended section 106 of the Bankruptcy Code.

[12] Moreover, even before section 106(a) was amended, numerous courts (including in this District) held that the Anti-Injunction Act does not preclude this Court from granting injunctive relief against the IRS. *See, e.g., In re La Difference Restaurant, Inc.*, 63 B.R. 819, 825 (S.D.N.Y. 1986); *In re Bostwick*, 521 F.2d 741, 744 (8th Cir. 1975); *In re Jon Co.*, 30 B.R. 831, 834-35 (D. Colo. 1983); *In re H & R Ice Co.*, 24 B.R. 28, 31-32 (Bankr. W.D. Mo. 1982); *In re Datair Sys. Corp.*, 37 B.R. 690, 696-97 (Bankr. N.D. Ill. 1983); *But see In re Becker's Motor Transp.*, 632 F.2d 242, 246 (3d Cir. 1980).

48. Accordingly, the relief requested in the Motion can be granted by this Court despite the Anti-Injunction Act.

WHEREFORE the Debtor respectfully requests the Court issue an order, substantially in the form attached hereto, granting (i) the relief requested herein pursuant to the proposed orders attached hereto as Exhibits A and B, and (ii) such other and further relief as the Court may deem just and appropriate.

Dated: New York, NY
      November 9, 2010

DEWEY & LEBOEUF LLP

/s/ Peter A. Ivanick
Peter A. Ivanick, Esq.
Martin J. Bienenstock, Esq.
Lawrence M. Hill, Esq.
1301 Avenue of the Americas
New York, New York 10019
Telephone: 212.259.8000
Facsimile: 212.259.6333

*Attorneys for the Debtor and
Debtor in Possession*